## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **ELIZABETH GOODWIN,** | **Case No.** |
| **Administrator of the Estate of Malissa** | |
| **Williams, Deceased** | **Judge** |
| **c/o David B. Malik** | |
| **Attorney at Law** | |
| **8437 Mayfield Rd. Suite 101** | **COMPLAINT AND JURY DEMAND** |
| **Chesterland, OH  44406,** | **(Wrongful Death)** |
| | |
| **and** | |
| | |
| **DEBORA L. BODNAR,** | |
| **Administrator** | |
| **of the Estate of Timothy** | |
| **Ray Russell, Deceased** | |
| **10895 Bradley** | |
| **Concord Twp., OH  44077** | |
| | |
| **Plaintiffs,** | |
| | |
| **v.** | |
| | |
| **CITY OF CLEVELAND** | |
| **601 Lakeside Ave** | |
| **Cleveland, Ohio 44114,** | |
| | |
| **and** | |
| | |
| **MICHAEL BRELO** | |
| **CYNTHIA MOORE** | |
| **MICHAEL RINKUS** | |
| **ERIN O'DONNELL** | |
| **SCOTT SISTEK** | |
| **RANDY PATRICK** | |
| **CHRISTOPHER EREG** | |
| **MICHAEL DEMCHAK** | |
| **WILFREDO DIAZ** | |
| **MICHAEL FARLEY** | |
| **BRIAN SABOLIK** | |
| **WILLIAM SALUPO** | |
| **PAUL BOX** | |
| **VASILE NAN** | |

**ALAN ALMEIDA**                               )
**DAVID SIEFER**                               )
**JAMES HUMMEL**                               )
**WILLIAM MIRANDA**                            )
**Sgt. PATRICIA COLEMAN**                      )
**Sgt. MATTHEW PUTNAM**                        )
**Sgt. RANDOLPH DAILEY,**                      )
**c/o Cleveland Police Department**            )
**1300 Ontario St**                            )
**Cleveland, OH 44113,**                       )
                                               )
**Individually and in Their Official**         )
**Capacities as Employees of the City of**     )
**Cleveland, Ohio,**                           )
                                               )
**and**                                        )
                                               )
**CHIEF MICHAEL MCGRATH**                      )
**601 Lakeside Ave**                           )
**Cleveland, Ohio 44114,**                     )
                                               )
**Individually and in His Official**           )
**Capacity as the Chief of Police of the**     )
**City of Cleveland,**                         )
                                               )
**and**                                        )
                                               )
**MAYOR FRANK JACKSON**                        )
**601 Lakeside Ave**                           )
**Cleveland, Ohio 44114,**                     )
                                               )
**Individually and in His Official**           )
**Capacity as Mayor of the City of**           )
**Cleveland,**                                 )
                                               )
**and**                                        )
                                               )
**DIRECTOR MARTIN FLASK**                      )
**601 Lakeside Ave**                           )
**Cleveland, Ohio 44114,**                     )
                                               )
**Individually and in His Official**           )
**Capacity as Safety Director of the City**    )
**of Cleveland,**                              )
                                               )
**and**                                        )

2

**JOHN AND JANE DOE**                      )
**CLEVELAND POLICE**                       )
**SUPERVISORS 1-10,**                      )
**c/o Cleveland Police Department**        )
**1300 Ontario St**                        )
**Cleveland, OH 44113,**                   )
                                           )
**Individually and in Their Official**     )
**Capacities as Employees of the City of** )
**Cleveland, Ohio,**                       )
                                           )
**and**                                    )
                                           )
**JOHN AND JANE DOE**                      )
**CLEVELAND POLICE OFFICERS**              )
**11-20,**                                 )
**c/o Cleveland Police Department**        )
**1300 Ontario St**                        )
**Cleveland, OH 44113,**                   )
                                           )
**Individually and in Their Official**     )
**Capacities as Employees of the City of** )
**Cleveland, Ohio,**                       )
                                           )
**and**                                    )
                                           )
**JOHN AND JANE DOE**                      )
**CLEVELAND POLICE**                       )
**DISPATCHERS 21-25,**                     )
                                           )
**c/o Cleveland Police Department**        )
**1300 Ontario St**                        )
**Cleveland, OH 44113,**                   )
                                           )
**Individually and in Their Official**     )
**Capacities as Employees of the City of** )
**Cleveland, Ohio,**                       )
                                           )
**Defendants.**                            )
                                           )

## I. PRELIMINARY STATEMENT

1.  This case challenges the gratuitous, excessive, and objectively unreasonable force members of the Cleveland Police Department used against Malissa Williams and Timothy Ray Russell on November 29, 2012. It also challenges supervisors in the Cleveland Police Department who proximately caused the excessive force when they failed to supervise their subordinate officers. On November 29, 2012, Malissa Williams was an unarmed passenger in a light blue 1979 Chevy Malibu owned and operated by Timothy Russell.  The Cleveland police intentionally and deliberately violated the law, as well as their operational rules, regulations, policies and procedures, during their pursuit and felony stop of the car containing Malissa Williams and Timothy Russell. All Defendants' acts were clearly established violations of the United States Constitution and Ohio law.

## II. JURISDICTION

2.  Jurisdiction over claims arising from Defendants' violations of the Civil Rights Act is conferred upon this Court by 28 U.S.C. § 1331, 1343 (3) and (4).

3.  Jurisdiction over state law claims is conferred upon this Court by 28 U.S.C. §1367.  This action is brought pursuant to claims arising under the laws of the State of Ohio, 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.  This action is also brought pursuant to 28 U.S.C. §§ 1983, 1985 and 1988 as it is also an action for compensatory damages, punitive damages, and attorney fees.

4.  Venue is proper in this division.

## III. PARTIES

5.  Plaintiff Elizabeth Goodwin was appointed as Administratrix of the Estate of Malissa

    Williams on February 6, 2013 by the Probate Court of Cuyahoga County. Malissa Williams

    died on November 29, 2012.  Ms. Goodwin brings this suit as the Administratrix of the

    Estate of Malissa Williams, in her fiduciary capacity, for the benefit of the next of kin and

    heirs at law of Malissa Williams. At all times herein, and at the time of her death, Malissa

    Williams was a resident of Cuyahoga County, Ohio

6.  Plaintiff Debora L. Bodnar is the Administrator of the Estate of Timothy Ray Russell,

    deceased, under authority of the Entry Appointing Fiduciary; Letters of Authority entered by

    the Probate Court of the Court of Common Pleas of Cuyahoga County, Ohio, on January 7,

    2013, Case Number 2013EST185194.  At the time of his death, Plaintiff's Debora L.

    Bodnar's decedent, Timothy Ray Russell, was a resident of Maple Heights, Cuyahoga

    County, Ohio.

7.  Defendant City of Cleveland is a municipality organized under the laws of the State of Ohio.

8.  Defendant Michael Brelo was at all times relevant to this action a police officer employed by

    the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all

    times relevant to this case acted under color of law.  He is sued both in his individual and

    official capacities.

9.  Defendant Cynthia Moore was at all times relevant to this action a police officer employed

    by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at

    all times relevant to this case acted under color of law.  She is sued both in his individual and

    official capacities.

10. Defendant Michael Rinkus was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

11. Defendant Erin O'Donnell was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  She is sued both in his individual and official capacities.

12. Defendant Scott Sistek was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

13. Defendant Randy Patrick was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

14. Defendant Christopher Ereg was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

15. Defendant Michael Demchak was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. §

1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

16. Defendant Wilfredo Diaz was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

17. Defendant Michael Farley was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

18. Defendant Brian Sabolik was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

19. Defendant William Salupo was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

20. Defendant Paul Box was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

21. Defendant Vasile Nan was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

22. Defendant Alan Almeida was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

23. Defendant David Siefer was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

24. Defendant James Hummel was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

25. Defendant William Miranda was at all times relevant to this action employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in her individual and official capacities.

26. Defendant Patricia Coleman was at all times relevant to this action a police officer employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at

all times relevant to this case acted under color of law.  She is sued both in her individual and official capacities.

27. Defendant Matthew Putnam was at all times relevant to this action a Supervisor employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

28. Defendant Randolph Dailey was at all times relevant to this action a Supervisor employed by the Cleveland Police Department.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

29. Defendant Michael McGrath was at all times relevant to this action the Chief of Police for the City of Cleveland.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

30. Defendant Frank Jackson was at all times relevant to this action the Mayor of Cleveland.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

31. Defendant Martin Flask was at all times relevant to this action the Safety Director for the City of Cleveland.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued both in his individual and official capacities.

32. John and Jane Doe Cleveland Police Supervisors 1-10 were at all times relevant to this action police officers employed by the Cleveland Police Department.  Defendants are "persons"

under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. Defendants are sued both in their individual and official capacities.

33. John and Jane Doe Cleveland Police Officers 11-20 were at all times relevant to this action police officers employed by the Cleveland Police Department.  Defendants are "persons" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. Defendants are sued both in their individual and official capacities.

34. John and Jane Doe Cleveland Police Dispatchers 21-25 were at all times relevant to this action police dispatchers employed by the Cleveland Police Department.  Defendants are "persons" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  Defendants are sued both in their individual and official capacities.

35. When the term "Officer Defendants" or "Defendant Officers" is used in this Complaint, it refers to the Cleveland Police Department officers who were present during the use of excessive force on Malissa Williams and/or Timothy Russell.  As set out below, Officer Defendants who used excessive force on Malissa Williams and/or Timothy Russell acted willfully, wantonly or recklessly.

36. When the term "Supervisor Defendants" or "Defendant Supervisors" is used in this Complaint, it refers to any Supervisory officials who were either present during the purusit of and use of force on Malissa Williams or Timothy Russell, or were responsible for training, supervising, and investigating the use of force by Cleveland Police Officers up to and through November 29, 2012, including the use of force by officers on Malissa Williams and/or Timothy Russell.

## IV. FACTS

**THE NOVEMBER 29, 2012 POLICE SHOOTING IN EAST CLEVELAND, OHIO**

37. On November 29, 2012, Timothy Russell drove his 1979 light blue Chevy Malibu through the streets of Cleveland and East Cleveland. Numerous officers of the Cleveland Police Department pursued him.

38. At one point in time, as many as sixty-four (64) Cleveland police cars had joined the pursuit. The police had pursued Mr. Russell for approximately twenty-seven (27) minutes when he drove his Chevy Malibu, with Ms. Williams in the passenger seat, towards Heritage Middle School's parking lot. Heritage Middle School is located in East Cleveland, Ohio, a town bordering Cleveland, Ohio.

39. Mr. Russell drove the Malibu from Wymore Avenue onto the "bus loop" at Heritage Middle School. He then took the first right, onto an access road that came to a dead end at the school's parking lot.

40. The procession of police cars followed the Malibu and also turned right onto the access road that led to the parking lot. At least nine police cars were only seconds behind the Malibu when it turned onto the access road and drove to the parking lot.

41. Because the access road was the only way one could drive to or from the parking lot, the police cars had trapped the Malibu, and Ms. Williams and Mr. Russell, in the parking lot.

42. Less than one minute later, Ms. Williams and Mr. Russell sat dead in the Malibu. At least 13 officers had fired 137 bullets at them from close range.

43. Ms. Williams and Mr. Russell were unarmed during the entire pursuit, as well as when they were shot dead. Mr. Russell's greatest offense was fleeing the police.

11

44. When the police procession turned onto the parking lot's access road behind the Malibu, they were in the following order behind the Malibu: (1) Defendants Officers Siefer and Hummel in marked Car 243A; (2) Officer O'Neill and Defendant Diaz in marked Car 215; (3) Officers Mateo and Rescina in marked Car 326; (4) Officer Fairchild in unmarked Car 288; (5) Defendant Officers Salupo and Rinkus in Car 297; (6) Officer McNeeley in unmarked Car 27; (7) Defendant Supervisor Sergeant Coleman and Defendant Officer Miranda in unmarked Car 285; (8) Defendant Officers Radosevic and Sistek in marked Car 238; (9) Defendant Officers Moore and Brelo in marked Car 217; (10) Defendant Officers Box and Patrick in marked Car 245;  (11) Defendant Officers Farley and Sabolik in marked Car 234; (12) Defendant Officers O'Donnell and Demchak in unmarked car 3V81; and (13) Defendant Officer Ereg and Defendant Supervisor Sergeant Matthew Putnam in unmarked Car 382.

**A.  The narrow road to Heritage Middle School enabled a police roadblock.**

45. The road into the Heritage Middle School is narrow, and barely accommodates two cars side by side. It is the only road that enters or exits the Heritage Middle School parking lot.

46. Pictures taken on November 29, 2012 immediately after the incident reflect that the road and the adjacent school playground were well lit that night by numerous bright, overhead lamps.

47. The parking lot's access road flowed straight into to the school's parking lot. At the end of the parking lot sat the large Heritage Middle School building. (See Plainitffs' Exhibit A, attached.)

48. Every single shot fired by the Cleveland police officers occurred either in the parking lot or on or near the parking lot access road.

**B. Upon entering the school parking lot, Cleveland police officers immediately surround Mr. Russell and Ms. Williams.**

49. When Mr. Russell drove the Malibu into the parking lot, there were no other cars parked in the lot.

50. Upon entering the parking lot area, Mr. Russell steered his Malibu to the right. He drove past a raised grass island in the parking lot on his left. Mr. Russell then began turning the Malibu to the left, attempting to drive around the island.

51. Defendant Officer William Salupo was present at the scene and he witnessed the events in the parking lot. He reported to BCI, the Bureau of Criminal Identification and Investigation, that the driver "knew that it was a dead end, because he tried to turn around."

52. Defendant Officers David Siefer and James Hummel occupied the first car behind the Malibu when the Malibu entered the parking lot. Their car was numbered 243A. They did not follow the Malibu when Mr. Russell drove it to the right of the island.  Instead, Defendant Officers Siefer and Hummel continued to drive their police car straight ahead, to the left of the island. They did this to secure the back of the parking lot and to prevent the Malibu from turning left, counter-clockwise, around the island if Mr. Russell attempted to exit the lot.

53. Defendant Officer Wilfredo Diaz and Officer O'Neill were present at the scene and occupied car number 215. Defendant Officer Diaz was driving and his partner, Officer O'Neill, was in the front passenger seat.

54. When Defendant Diaz first drove Car 215 into the parking lot, it was the second police vehicle behind the Malibu. Defendant Diaz drove directly behind the car operated by Defendant Officers Siefer and Hummel.

55. Having seen Defendant Officers Siefer and Hummel drive to the left of the island, Defendant Officer Diaz decided to follow behind the Malibu, to the right of the island.

13

56. Three more police cars entered the parking lot behind the car driven by Defendant Officer

    Diaz. These cars then took coordinated positions to "box-in" the Malibu.

**C. Defendant Officer Diaz's prohibited PIT maneuver sets in motion an irreversible chain of events that concluded with the gruesome deaths of Ms. Williams and Mr. Russell.**

57. Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

58. As the Malibu passed the island, Defendant Officer Diaz made no effort to end the pursuit

    without violence. Instead, he rapidly accelerated his police car to intentionally and forcefully

    strike the Malibu's rear quarter panel.

59. Defendant Officer Diaz's police car did strike the Malibu's driver's side rear quarter panel

    with significant force. Defendant Diaz performed a law enforcement tactic known as a PIT

    maneuver.

60. The purpose of performing a PIT maneuver is to seize a moving car and its occupants.

61. When BCI asked Defendant Diaz's partner, Officer O'Neill, to describe what happened, she

    stated "[W]e clipped them pretty good."

62. Defendant Diaz's use of the PIT maneuver on the Malibu constituted an unreasonable

    seizure.

63. Defendant Officer Diaz engaged the PIT maneuver despite knowing it had been prohibited

    by the Cleveland Police Department, which had never trained Defendant Officer Diaz on the

    maneuver's implementation.

64. Defendant Officer Diaz's PIT maneuver caused Mr. Russell to lose control of the Malibu; it

    fishtailed and spun counterclockwise in excess of 180 degrees, and also caused the Malibu's

    momentum to carry it to, and across the island.

**D. Defendant Officer Diaz then jumps out of his moving police car as he unholsters his gun.**

65. While the Malibu spun around in response to his PIT maneuver, Defendant Officer Diaz opened his car door and jumped out. Officer O'Neill remained in the passenger seat.

66. Defendant Officer Diaz reached for his gun as he bailed out of the police car he was driving. He left the gearshift in "Drive."

67. Officer O'Neill had no choice herself but to bail from the vehicle as well, leaving the driverless police car still moving and dangerous.

68. Defendant Officer Diaz admitted that he had no idea where his police car was going after he bailed from it.

**E. Defendant Officer Diaz is the first officer to shoot at Ms. Williams.**

69. After bailing out of his car, Defendant Officer Diaz again intentionally used unreasonable, excessive and gratuitous force. He pointed, aimed and fired two (2) shots at Ms. Williams, who was unarmed in the passenger seat.

70. Ms. Williams was not driving the car. She posed no threat to Defendant Officer Diaz. A police broadcast had informed officers, including but not limited to Defendant Officer Diaz, that Ms. Williams did not have a gun. Furthermore, at all times Ms. Williams was a passenger in a car that was driving away from police.

**F. As the Malibu spun and slowed to an almost stationary position on the first island after being forcefully struck, Defendant Officer Diaz committed further violations of the law by unreasonably firing his semi-automatic weapon at Ms. Williams and Mr. Russell.**

71. After Defendant Officer Diaz precipitated the deadly shooting of Ms. Williams and Mr. Russell with his unauthorized PIT maneuver, and the fired two (2) shots at Ms. Williams, the Malibu slowed to a crawl on the island. The Malibu and its passengers had been seized.

72. The decreasing speed of the Malibu presented Defendant Officer Diaz with a cognizable pause in the action. Instead of ordering Mr. Russell to surrender, or take any other tactical advantage of this pause, Defendant Officer Diaz intentionally and deliberately aimed his gun and fired two more shots at Mr. Russell.

73. After the gunfire, Defendant Officer Diaz ran "some distance" to where the police car he had abandoned had stopped.

74. The Malibu continued forward with Ms. Williams and Mr. Russell still inside it.

G. **Other officers at the scene do not shoot following Defendant Officer Diaz's use of deadly force against Ms. Williams and Mr. Russell in the parking lot.**

75. At least four or more police cars, in addition to Defendant Officer Diaz's, were located in the parking lot when Defendant Officer Diaz used deadly force three separate times when he performed an unreasonable PIT maneuver and fired two shots, on two separate occasions, at each occupant of the Malibu.

76. Defendant Officer Diaz's PIT maneuver and gunshots prevented the other officers present from acting in a proactive manner to de-escalate the unfolding events. No supervisory officer took command, control, or any supervisory role over the officers as events unfolded in the parking lot.

77. The officers at the Heritage Middle School had no supervisor directing or coordinating their conduct, despite the fact that numerous supervisors had been monitoring the radio traffic related to the 27-minute police pursuit that ended at the school.

78. As the events unfolded in the parking lot, Defendant Sergeant Coleman and Defendant Officer Miranda were in an unmarked, silver police car numbered Unit 285 that was driving on the access road towards the parking lot.

79. Driving on the access road behind Unit 285 was marked Cleveland Police Department police car numbered Unit 238. Defendant Officers Sistek and Radosevic occupied Unit 238.

80. Driving on the access road a very short distance behind Unit 238 was marked Cleveland Police Department police car numbered Unit 217. Defendant Officers Brelo and Moore occupied Unit 217.

81. When Defendant Officer Diaz fired his gun at the Malibu, Unit 285 and Unit 238 immediately stopped on the access road.  Unit 285 and Unit 238 were both facing towards the parking lot.

82. Defendant Sergeant Coleman in Unit 285, and Defendant Officer Siefer in Unit 238 both broadcast on the main police radio channel, "Shots fired! Shots Fired!"

83. Neither Defendant Sergeant Coleman's, nor Defendant Officer Siefer's radio broadcast identified who had fired the shots, where the shots were fired from, why the shots were fired or any other information about the gunshots.

84. Similarly, none of the officers present broadcast questions or sought clarification from Defendants Siefer and Coleman about who fired the shots, why the shots were fired, where the shots were fired from or what was occurring.

85. Defendant Sergeant Coleman was the only Cleveland Police supervisor present. She failed to take command of the events as they began to unfold and, instead, hid out of view in her car, acquiescing to the conduct of the subordinate officers she was responsible for.

**H.  Officers Mateo and Rescina, unlike Defendant Officer Diaz, do not shoot because of their "backdrop training."**

86. After the Malibu moved off the island, it continued moving slowly back down the road in the direction of the entrance to the parking lot.

87. The Malibu, still driven by Mr. Russell, slowly passed by Officer Mateo and Officer Rescina who were in car 326.

88. Officers Mateo and Rescina exited their police car and took cover behind another police car nearby. Neither fired his weapon at the occupants of the Malibu.

89. Officer Mateo left his cover one time and immediately retreated because of the "backdrop training" he had received.

90. "Backdrop training" is an assessment tool used by police officers. "Backdrop training" is training designed to allow officers to intelligently and rationally assess events as they unfold.

91. Officer Mateo has indicated that his "backdrop training" mandated that he could not permissibly shoot in the presence or possibility of crossfire.

92. Similarly, Officer Rescina did not shoot because he had no "tactical advantage" and he did not want to put other officers in danger of crossfire.

**I.  Officer Cruz and Officer Gonzalez, unlike Defendant Officer Diaz, did not shoot.**

93. The Malibu slowly continued down the road and passed Officer Cruz and Officer Tony Gonzalez. Both adhered to their training and did not fire their weapons.

**J.  Officer Fairchild, unlike Defendant Officer Diaz, did not shoot**

94. The Malibu then continued past Officer Kevin Fairchild.

95. Officer Fairchild told BCI investigators that, "I knew he was not going to be able to get out with all the cars that were behind us." Officer Fairchild did not fire his weapon.

96. Officer Fairchild also knew that Ms. Williams and Mr. Russell were not armed. During the pursuit he drove close behind the Malibu and visually confirmed that the individuals inside it did not have a weapon. Officer Fairchild then broadcast the fact that the Malibu's occupants

were unarmed over police radio to inform the other officers involved in the pursuit that there was not a weapon.

97. The Malibu then passed Defendant Officers Salupo and Rinkus, who were driving their unmarked police car in the opposite direction. They immediately turned around to follow the Malibu.

98. At no time did Defendant Officer Salupo see a gun in the Malibu.

**K. Officer McNeely and Defendant Sergeant Coleman and Defendant Officer Miranda, unlike Defendant Officer Diaz, do not shoot.**

99. The Malibu continued past Officer McNeeley, who did not fire his weapon.

100.   The Malibu next reached and passed Defendant Sergeant Coleman and Defendant Officer Miranda, who were hiding out of sight in Unit 285, which they stopped on the access road when they heard Defendant Officer Diaz's shots.

101.    Defendant Officer Coleman and Officer Miranda remained hiding on the floor of their car, and out of sight, until all thirteen members of the Cleveland Police Department who fired their weapons had stopped shooting Mr. Russell and Ms. Williams.

**L. Defendant Officers Scott Sistek, Michael Brelo and Cynthia Moore point, aim and fire their weapons at the Malibu from a position in front of it. The Malibu then contacts Car 238 and stops.**

102.   After stopping Car 238, Defendant Officer Radosevic exited from the driver side. Defendant Officer Sistek exited the car at the same time from the passenger side.

103.   Defendant Officer Sistek explained to BCI investigators that the width of the road was "just not enough for like two cars to fit in the drive."

104.   Defendant Officers Radosevic and Sistek had parked Unit 238 to create a roadblock to prevent the Malibu exiting the school grounds, so they could seize Ms. Williams and Mr. Russell.

19

105.    As the Malibu returned down the parking lot access road, Defendant Officer Sistek

pointed, aimed and fired one (1) shot at the occupants of the Malibu, while moving towards

the back of his police car.

106.    Once he was behind Car 238, Defendant Officer Sistek pointed, aimed and fired two (2)

additional rounds at the occupants of the Malibu.

107.    Defendant Officers Michael Brelo and Cynthia Moore watched Defendant Sistek fire

three (3) shots at the Malibu as they drove in Car 217 towards Defendant Sistek and Car 238.

108.    As Defendant Brelo parked Car 217 just a few feet to the right of Defendant Officer

Sistek, the Malibu contacted Car 238 and came to a stop.

109.    When the Malibu came to a stop at the roadblock, neither Ms. Williams, not Mr. Russell

attempted to flee or otherwise resist the police officers that had them surrounded. Ms.

Williams and Mr. Russell had been intentionally, and successfully, seized by the Cleveland

Police present.

**M. From inside their police car, Defendant Officers Brelo and Moore point, aim and
   fire through their front windshield at Ms. Williams and Mr. Russell.**

110.    Once the Malibu made contact with Car 238, Defendant Officer Brelo intentionally

pointed, aimed and fired his gun at Ms. Williams and Mr. Russell through the windshield of

his police car. Defendant Brelo fired his weapon from the driver's seat of his car.

111.    Defendant Officer Brelo pointed, aimed and fired at the occupants of the Malibu until he

had emptied his first ammunition magazine.

112.    At the same time Defendant Brelo pointed, aimed and fired his weapon at the occupants

of the Malibu, his partner, Defendant Officer Moore, sat next to him and also intentionally

pointed, aimed and fired at the unarmed occupants of the Malibu.

20

**N. Defendant Officers William Salupo and Michael Rinkus establish a second roadblock and unreasonably, excessively and gratuitously fire at Ms. Williams and Mr. Russell after they had already been seized.**

113.    Defendant Officers William Salupo and Michael Rinkus turned their car around in the parking lot to follow the Malibu after it passed them travelling down the access road away from the parking lot. They parked their car on the access road behind Unit 285, where Defendant Sergeant Coleman and Defendant Officer Miranda were hiding.

114.    Defendant Officers Salupo and Rinkus parked in that location to establish a second roadblock, and box-in the Malibu.

115.    The Malibu sat trapped between two police roadblocks that were established roughly three to four car lengths apart.

116.    This additional roadblock created by Defendant Officers Salupo and Rinkus led them to believe the situation had been de-escalated.

117.    Defendant Officers Salupo and Rinkus exited their car and began on foot toward the Malibu.

118.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police, who had surrounded them and prevented any chance of flight.

**O. Defendant Officers Brelo and Moore point, aim and fire again.**

119.    As Defendant Officer Salupo moved toward the stationary Malibu, Defendant Officers Brelo and Moore were firing their weapons at Ms. Williams and Mr. Russell from inside Unit 217.

120.    Defendant Officer Rinkus pointed, aimed and fired thirteen (13) shots at the occupants of the Malibu.

121.    Defendant Officer Salupo also fired his weapon two (2) times from a position behind his partner.

122.    After Defendant Officer Rinkus had emptied his magazine, he and Defendant Salupo retreated back behind their police car.

123.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**P. Defendant Officers excessively, gratuitously and unreasonably continue to aim and fire at Ms. Williams and Mr. Russell long after they had been seized and subdued.**

124.    The Malibu remained stationary. Mr. Russell and Ms. Williams were subdued. But the Defendant Officers continued to terrorize and barrage Ms. Williams and Mr. Russell with unreasonable, excessive and gratuitous gunfire.

125.    Defendant Officer Sistek rejoined the volleys of gunfire and fired (9) more shots at Ms. Williams and Mr. Russell.

126.    Defendant Officer Brelo then exited Unit 217, moved to a new location to his left behind Unit 238, and again pointed, aimed and fired his gun at Ms. Williams and Mr. Russell. Eventually Defendant Officer Brelo ceased firing, not in response to any command, but only because he had emptied his second ammunition magazine.

127.    After firing her weapon from inside Unit 217's front passenger seat, Defendant Officer Moore exited her car at the same time as Defendant Officer Brelo. She moved to her right, away from her police car and onto the grass next to the playground. She then turned toward the Malibu and assumed a "firing position."

128.    From her position on the lawn, Defendant Moore pointed, aimed and shot seven (7) more times into Mr. Russell's side of the Malibu.

129.    By this point, Defendant Officers Rinkus and Salupo, who were located on the other side

of the Malibu, had stopped firing and had already moved behind their unmarked police car

further up the access road, closer to the parking lot's entrance.

130.    Up to this point, none of the officers or supervisors in close proximity to the gunfire,

including, but not limited to, Defendant Officers Sistek, Radosevic, Brelo, Moore, Rinkus,

Salupo, Miranda and Sergeant Coleman, had attempted to intervene to stop their fellow

officers from using unreasonable and excessive force against Ms. Williams and Mr. Russell.

None of them had called "cease fire."  None of them had given the occupants of the

stationary and road-blocked Malibu the opportunity to verbally communicate with officers.

131.    These Defendant Officers failed to intervene despite opportunities to do so, despite a duty

to do so, and despite it being foreseeable that their fellow officers would continue to use

excessive, unreasonable and deadly force against Ms. Williams and Mr. Russell.

132.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**Q. Defendant Officers intentionally, excessively, gratuitously and unreasonable point, aim and fire repeatedly, without pause or restraint.**

133.    At the same time Defendant Officers Brelo and Moore abandoned Car 217 for new

locations and more opportunities to shoot, two additional marked police cars arrived at the

scene.

134.    Both of these police cars parked behind Car 217.

135.    Defendant Officers Box and Patrick occupied the first marked police car, which was Car

245.

136.    Defendant Officers Farley and Sabolik occupied the second marked police car, which

was Car 234.

137.     Defendant Officer Patrick parked his police car first. Both he and Defendant Officer Box immediately exited their vehicle and approached the Malibu.

138.     Defendant Officer Box exited from the passenger side and moved across the grass to the front passenger side of Car 217, where he took cover to the left of Defendant Moore.

139.     Defendant Officer Patrick exited and crawled from the driver side of his police car to the passenger side of Car 217, where he took cover alongside Defendants Box and Moore.

140.     At this point, Defendant Officer Patrick observed that the windshield of Car 217, the car Defendant Officers Brelo and Moore had exited moments earlier was "riddled with bullet holes."

141.     Defendant Farley exited Car 234 from the driver's side.

142.     Defendant Officer Farley moved to a position beside Defendant Officer Brelo behind Car 238. From his position behind Defendant Officer Brelo, Defendant Officer Farley fired three (3) bullets at both occupants of the Malibu.

143.     Defendant Officer Sabolik exited Car 234 from the passenger side at the same time Defendant Farley exited it.

144.     Upon exiting, Defendant Officer Sabolik pointed, aimed and fired two (2) times at both occupants of the Malibu as he ran backward to the rear of his car. Moments later, Defendant Officer Sabolik moved around his car to the driver side door.

145.     The first volley of gunfire then came to a stop.

146.     Up to this point, none of the officers or Supervisors in close proximity to the gunfire, including, but not limited to, Defendant Officers Sistek, Radosevic, Brelo, Moore, Rinkus, Salupo, Patrick, Box, Sabolik, Farley and Miranda, and Sergeant Coleman had attempted to

intervene to stop their fellow officers from using excessive, gratuitous and unreasonable force against Ms. Williams and Mr. Russell.

147.    These Defendant Officers and Sergeant Coleman failed to intervene despite opportunities to do so, despite a duty to do so, and despite it being foreseeable that their fellow officers would continue to use excessive, gratuitous and unreasonable force against Ms. Williams and Mr. Russell.

148.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**R. There is a pause in the gunfire and additional Defendant Officers join the scene. The Defendant Officers execute a second volley of excessive, gratuitous and unreasonable gunfire.**

149.    When the first volley of gunfire stopped, a moment of calm descended over the scene.

150.    As the first volley's gunfire subsided, two more unmarked cars arrived at the scene.

151.    Defendant Officers Erin O'Donnell and Michael Demchak arrived, exited their car, and joined Defendant Officers Sistek, Radosevic, Farley and Brelo at car 238 after the first volley of gunfire.

152.    Defendant Officer Christopher Ereg and Defendant Supervisor Sergeant Matthew Putnam occupied the second unmarked vehicle that arrived. They also exited their car and joined the group behind Car 238.

153.    There were now eleven (11) Cleveland police officers in a semi-circle surrounding the Malibu and its occupants.

154.    The Defendant Officers and Defendant Supervisors who were surrounding the Malibu used the moment of calm to reload their weapons and to coordinate their impending decimation of Ms. Williams and Mr. Russell through a second volley of high-powered ammunition.

25

155.  The Malibu was surrounded. The Malibu was between two roadblocks.  The occupants were had been seized and were subdued. The Malibu had remained stationary since it came to rest against Car 238.

156.  Suddenly the calm was shattered by more unnecessary and excessive gunshots directed towards Ms. Williams and Mr. Russell. Approximately sixty more bullets were directed at Ms. Williams and Mr. Russell from nine police officers surrounding the Malibu. Ms. Williams and Mr. Russell sat less than 20 feet away from the Defendant Officers who were unreasonably targeting them for a second time.

157.  The Defendant Officers' decision to re-commence a gratuitous, unreasonable and excessive use of deadly force for a second time was willful, wanton, reckless and malicious. It shocks the conscience.

158.  When Defendant Supervisor Sergeant Putnam arrived, he and Defendant Sergeant Coleman were the only Supervisors at the scene. They were responsible for directing and supervising the patrol officers present at the scene with them.

159.  Defendant Sergeant Putnam watched his subordinate officers fire bullets into Ms. Williams and Mr. Russell in an objectively unreasonable manner. He failed to exercise a supervisory role, instead choosing to acquiesce to his subordinates' continued violation of Ms. Williams and Mr. Russell's constitutional rights, in violation of Ohio state law.

160.   Despite her supervisory status, Defendant Sergeant Coleman remained hiding, out of sight just a few feet away in Car 285 for the entire time her subordinates fired their weapons.

161.   Neither Defendant Sergeant Coleman, nor Defendant Sergeant Putnam halted the malicious, unreasonable, excessive and gratuitous second assault on Ms. Williams and Mr.

Russell. They altogether failed to command their subordinate officers, and acquiesced to their subordinates' second use of excessive force.

162.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**S.  Defendant Officer Cynthia Moore participates in the excessive, gratuitous and unreasonable second volley of gunfire.**

163.    During the second volley of gunfire, Defendant Officer Cynthia Moore pointed, aimed and fired her gun ten (10) more times from her position on the grass by the playground. As she reloaded her second magazine, she yelled for Defendant Officer Patrick to retrieve a shotgun because she felt "it wasn't done." Defendant Officer Moore acted in this manner despite Ms. Williams and Mr. Russell being subdued.

164.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**T.  Defendant Officer Patrick participates in the excessive, gratuitous and unreasonable second volley of gunfire.**

165.     During the second volley of gunfire, Defendant Officer Patrick popped up from behind Car 217 and pointed, aimed and fired nine (9) shots at the occupants in the Malibu. During the second volley of gunfire, Defendant Officer Patrick replied "Hell No!" when Defendant Officer Moore  yelled for him to retrieve a shotgun.  Defendant Officer Patrick acted in this manner despite Ms. Williams and Mr. Russell  being subdued.

166.    Once the shooting had ended, Defendant Officer Patrick felt blood running down his forehead and saw blood on his hand.  He concluded, "It must have been from, like maybe the glass from the windshield."

167.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**U.  Defendant Officer Sabolik participates in the excessive, gratuitous and unreasonable second volley of gunfire.**

168.    When the second volley of began, Defendant Officer Sabolik remained at his position some distance behind the semi-circle of officers that had surrounded the Malibu. Despite the fact that he had nearly a dozen officers in his sight and was not close enough to the Malibu to have seen anything necessitate the use of deadly force, he pointed, aimed and fired his gun two (2) more times at the occupants of the Malibu. Defendant Officer Sabolik acted in this manner despite Ms. Williams and Mr. Russell being subdued.

169.    When questioned by BCI investigators about the incident,  Defendant Officer Sabolik admitted that he had only stopped shooting to avoid hitting Defendant Officer Brelo.

170.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**V.  Defendant Officer Michael Farley participates in the excessive, gratuitous and unreasonable second volley of gunfire.**

171.    After the pause in the shooting, Defendant Officer Farley shot at the occupants of the Malibu one (1) more time. He only stopped to avoid hitting Defendant Officer Brelo. Defendant Officer Farley acted in this manner despite Ms. Williams and Mr. Russell being subdued.

172.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**W. Defendant Officer O'Donnell participates in the excessive, gratuitous and unreasonable second volley of gunfire.**

173.    Upon reaching Car 238, Defendant Officer O'Donnell moved into position beside Defendant Officer Sistek on the driver side of Car 238. From this position, she had a clear shot at Ms. Williams on the passenger side of the Malibu.

174.    Although Defendant Officer O'Donnell was not present for the first volley of gunfire, and had received almost no information about what had taken place before she arrived, when the

second volley of gunfire commenced, she pointed, aimed and fired twelve (12) rounds into the passenger window at Ms. Williams.  Defendant O'Donnell acted in this manner despite Ms. Williams and Mr. Russell being subdued.

175.    Defendant O'Donnell informed BCI investigators, "When the passenger stopped moving is when I stopped shooting." This comment by Defendant Officer O'Donnell that she observed Ms. Williams still moving at this point in time reflects that Ms. Williams was alive while being shot and experienced horrifying conscious pain and suffering.

176.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**X.  Defendant Officer Michael Demchak participates in the excessive, gratuitous and unreasonable second volley of gunfire.**

177.    Although Defendant Officer Demchak was not present for the first volley of gunfire and had received almost no information about what had taken place before he arrived,  he reported that he pointed, aimed and fired four (4) times at Mr. Russell during the second volley of gunfire. Defendant Officer Demchak acted in this manner despite Ms. Williams and Mr. Russell being subdued.

178.    Defendant Officer Demchak unreasonably and without credibility alleged that he believed the shooting lasted as long as it did because Ms. Williams and Mr. Russell were fortified with bulletproof vests inside the Malibu. Ms. Williams and Mr. Russell were not wearing bulletproof vests.

179.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**Y. Defendant Officer Christopher Ereg participates in the excessive, gratuitous and unreasonable second volley of gunfire.**

180.    After exiting their car, Defendants Officer Christopher Ereg and Defendant Sergeant Matthew Putnam ran over a hill and took cover behind the driver side of Car 238, alongside Defendant Officers O'Donnell and Sistek.

181.    Although Defendant Officer Ereg was not present for the first volley of gunfire and had received almost no information about what had taken place before he arrived, he took aim at Ms. Williams and joined the other Defendant Officers in pointing, aiming and firing. He pointed, aimed and fired at Ms. Williams six (6) times. Defendant Officer Ereg acted in this manner despite Ms. Williams and Mr. Russell being subdued.

182.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**Z. Defendant Officer Brelo participates in the excessive, gratuitous and unreasonable second volley of gunfire.**

183.    After the pause in the shooting, Defendant Officer Brelo failed to adequately and tactically assess the moment. As the second volley of gunfire began, Defendant Officer Brelo stepped off the ground and onto the back of Car 238 as he fired his gun at Ms. Williams and Mr Russell. He continued firing as he unreasonably stepped off Car 238's back and onto the hood of the Malibu. He then stood on the Malibu's hood and continued to point, aim and fire shoot through the Malibu's windshield directly at Ms. Williams and Mr. Russell. He only stopped shooting because he had emptied his third magazine. Defendant Officer Brelo acted in this excessive and unreasonable manner despite Ms. Williams and Mr. Russell being subdued.

184.    Defendant Officer Brelo attributed his actions to Marine training during his service in Iraq, in which the military had trained him to "go through the target."

185.    Defendant Officer Brelo pointed, aimed and fired at Ms. Williams and Mr. Russell  a

total of forty-nine (49) times.

186.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**AA.        Defendant Officer Box participates in the excessive, gratuitous and
unreasonable second volley of gunfire.**

187.    Defendant Officer Box had armed himself with a shotgun prior to exiting his police car.

188.    During the second volley of gunfire, Defendant Officer Box moved around Defendant

Officers Patrick and Moore to find a clear shot at the Malibu from the grass by the

playground.

189.    As Defendant Officer Box aimed his shotgun, he felt he had been shot in his bulletproof

vest, but later inspection revealed nothing, so he concluded it must have been a ricochet of

flying glass.

190.    Defendant Officer Box fired his shotgun once into the driver side of the Malibu. This was

the last of the one hundred and thirty-seven (137) shots that tore apart the Malibu and struck

Ms. Williams and Mr. Russell, over the course of 17.8 seconds, robbing Ms. Williams and

Mr. Russell of their lives.

191.    Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**BB.        The aftermath of the second volley of gunfire.**

192.    Nine (9) of the Defendant Officers pointed, aimed and fired their weapons into the

Malibu during the second volley of gunfire. No imminent threat to the safety of the officers

had warranted their gruesome and terrorizing assault of Ms. Williams and Mr. Russell.

193.    Of the Defendant Officers who were outside of their cars surrounding the Malibu, only

Defendant Officers Putnam, Radosevic, Salupo and Rinkus restrained from firing their

weapons during the second volley of gunfire.

194.  Before the conclusion of the second volley of gunfire, none of the Defendant Officers or Supervisors in close proximity to the gunfire, including, but not limited to, Defendant Officers Sistek, Radosevic, Brelo, Moore, Rinkus, Salupo, Patrick, Box, Farley, Sabolik, Miranda, Demchak, O'Neill, Ereg, Sergeant Putnam and Sergeant Coleman, had attempted to intervene to stop their fellow officers from using excessive, gratuitous and unreasonable force against Ms. Williams and Mr. Russell.

195.  These Defendant Officers failed to intervene despite opportunities to do so, despite a duty to do so, and despite it being foreseeable that their fellow officers would continue to use excessive and unreasonable force against Ms. Williams and Mr. Russell.

196.  These Defendant Officers failed to intervene despite the fact that Ms. Williams and Mr. Russell had no weapons and posed no threat to the safety of police.

**CC.   Ms. Williams and Mr. Russell are mutilated by gunfire from police, who search the Malibu for a gun and confirm that Ms. Williams and Mr. Russell were unarmed.**

197.  After the shooting had stopped, Defendant Officer Ereg finally yelled, "Cease fire!"

198.  Defendant Officer Brelo placed the Malibu in park, removed the keys, and set them on the hood.

199.  Defendant Officer Diaz and Officer Rescina checked Ms. Williams and Mr. Russell for pulses. Defendant Officer Diaz also shook Ms. Williams and moved her leg to look for a gun, but found nothing.

200.  Defendant Sergeant Putnam called EMS.

201.  In the aftermath of the incident, it has become clear that a number of failures in training, execution, supervision, communication and tactics of the Cleveland Police Department led to Ms. Williams' and Mr. Russell's brutal deaths. But these failures were not only limited to the

events at Heritage Middle School. These same failures had plagued the conduct of members of the Cleveland Police Department from the moment they first came into contact with Ms. Williams and Mr. Russell earlier on the evening of November 29, 2012.

**SUPERVISORY FAILURES DURING THE PURSUIT PROXIMATELY CAUSE THE UNCONSTITUTIONAL USE OF FORCE THAT COST MS. WILLIAMS AND MR. RUSSELL THEIR LIVES.**

**A. Supervisors acted negligently, willfully, wantonly, recklessly, deliberately, maliciously and inadequately during the police pursuit on November 29, 2012.**

202.    On November 29, 2012, six (6) Supervisors from the Second District, seven (7) supervisors from the Third District, and four (4) supervisors from the Fifth District were entangled during different stages of the pursuit and excessive force that caused the wrongful deaths of Ms. Williams and Mr. Russell.

203.    The negligent, willful, wanton, reckless, deliberate, malicious and inadequate supervision by many of these Supervisors was in direct violation of General Police Order 3.2.02.  The policy in effect that night stated that "The sector supervisor shall . . . permit *no more than two police vehicles to directly engage in the pursuit*, except under unusual and well-articulated circumstances; the sector supervisor shall . . . control the pursuit by: (1) *monitoring and directing units* into or out of the pursuit, (2) assigning support and back-up units, [and] (3) approving or ordering alternative tactics; the sector supervisor shall . . . *be accountable for continuing a pursuit if circumstances indicate that the pursuit should be terminated*."

204.    Numerous violations by Defendant Supervisors of the above-stated policies and procedures on November 29, 2012, reflected a systemic failure of the Cleveland Police Department, its Supervisory officers, and the City of Cleveland.

205.    This systemic failure that was perpetuated by an unwritten, pervasive custom and practice of authorizing, and ordering, subordinate officers to deliberately disregard policies and procedures and, at times, direct orders, if there is a perception that an officer may be at risk.

**B. Second District Supervisors negligently, willfully, wantonly, recklessly, deliberately maliciously and inadequately failed to de-escalate the events by permitting the pursuit to continue beyond the two police car limit imposed by policy. Defendant Sergeant Dailey reported to BCI investigators: "It's unwritten but it's kind of a common practice that occurs."**

206.    On November 29, 2012, the Supervisors on duty for the Second District included: (1) Captain Ulrich Zouhar, (2) Defendant Sergeant Randolph Dailey, (3) Defendant Sergeant Patricia Coleman, (4) Sergeant Michael Donegan, (5) Sergeant Richard Martinez, (6) Sergeant Brian Chetnick, (7) Sergeant Brian Lockwood, and (8) Sergeant Jeff Williams.  All of these Supervisors were at the Second District police station, except for Sergeant Williams, who was on patrol with his partner, Officer Seana Kelly.

207.    Defendant Sergeant Dailey perfomed paperwork until he heard Defendant Officer Nan broadcast over the radio that two black males had fired a gun and that he was in pursuit.

208.    Supervisors Zouhar, Coleman, Donegan, Martinez, Chetnick, and Lockwood all heard this same broadcast from Defendant Officer Nan.

209.    Sergeant Donegan stated that his immediate intuition was to terminate the pursuit, given the number of officers involved. Instead he inexplicably decided to join the pursuit and left the Second District station alone in marked police car 253.

210.    Defendant Sergeant Dailey left the station alone in Car 220 to join the pursuit.

211.    At no point during the twenty-seven (27) minute pursuit did Defendant Sergeant Dailey make any decision to coordinate it or terminate it. He failed to do anything. He did nothing despite admitting he the supervisor responsible for coordinating the pursuit.

212.    Defendant Sergeant Dailey stated to BCI investigators that he deliberately failed to terminate the pursuit, and did not expect officers to request his permission to join the pursuit because he felt Officer Nan's radio broadcast "warranted [the pursuit's] continuation."  He admitted that he decided to abdicate his supervisory role over the pursuit due to "the nature of [Defendant Nan's] voice" in the first radio broadcast.

213.    When BCI investigators probed him further, Defendant Sergeant Dailey conceded that historically within the Cleveland Police Department, it was not unusual for other officers to join a pursuit without a Supervisor's permission. Furthermore, Defendant Sergeant Dailey admitted that, "It's kind of a common practice – kind of a policy – it's unwritten but it's kind of a common practice that occurs."

214.    Supervisor Defendant Dailey failed to terminate the pursuit, despite the growing number of police police cars that were rapidly exceeding the two-police car limit imposed by Cleveland Police Department policy.

215.    Defendant Sergeant Coleman failed to terminiate the pursuit and also participated in it. She failed to take control of her fellow pursuit officers. She condoned and permitted the pursuit officers to continue to violate the pursuit policy creating a dangerous, escalating police chase.

C. **Defendant Officers and Supervisors failed to inquire, assess and broadcast orders as critical events unfolded during the pursuit.**

216.    When the Malibu reached "Dead Man's Curve" Defendant Officers Siefer and Hummel occupied the lead car in the pursuit and were closest to the Malibu.

217.    By this point Defendant Sergeant Coleman had deliberately rounded up a posse of officers to join the pursuit without Defendant Sergeant Dailey's permission or awareness.

218.   In addition to herself, Defendant Sergeant Coleman's posse included Defendant Officers Rinkus, Salupo, Miranda, and Officers Fairchild, Mitchell and Graves.

219.   Defendant Sergeant Coleman's posse injected four unmarked police cars into the pursuit.

220.   At Dead Man's Curve, Defendant Officer Siefer heard a "pop," and claimed to see pieces of the Malibu fall from underneath it. Defendant Officer Siefer broadcast that the Malibu had lost a tire.

221.   Officer Fairchild drove the car behind Defendant Officers Siefer and Hummel. He also heard a loud bang and observed a flash emit from the tailpipe of the Malibu. He reiterated Defendant Officer Siefer's broadcast about the lost tire, but chose not to broadcast that he saw a flash emit from the Malibu's tailpipe.

222.   On I-90 East near the coal power plant, Defendant Officer Hummel heard another "pop" from the Malibu at the same time he saw a flash from the Malibu's tailpipe. He recognized that the Malibu was backfiring, but only told Defendant Officer Siefer what he saw.

223.   Defendant Officers Hummel and Siefer were still leading the pursuit.

224.   Defendant Officer Siefer deliberately and recklessly failed to broadcast that the Malibu was backfiring to any other officers or Supervisors.

225.   In the days after Ms. Williams and Mr. Russell were shot and killed by the Cleveland Police, Defendant Hummel confided in Lieutenant Matthew Balli. Defendant Officer Hummel confessed that he had observed the Malibu backfire fourteen to fifteen times while he and Defendant Officer Siefer were in the pursuit's lead position. He also confessed these observations to Lieutenant William Traine.

226.    Defendant Supervisors, including Defendant Sergeant Dailey had a duty to seek real-time

information regarding facts of the pursuit so it was effectively coordinated in a safe manner.

They failed to do so.

227.    In addition, the Cleveland Police Department's custom and practice of granting all

officers discretion in the manner they respond to perceived threats to fellow officer's safety

caused Defendant Officers, including Siefer and Hummel, to fail to report critical details they

witnessed that contradicted the basis of the pursuit. Moreover, this custom and practice

prevented supervisory officers from capably managing a pursuit that was escalating towards

a dangerous conclusion.

**D. Defendant Officers and Supervisors allowed unmarked police cars to jockey for the lead position in violation of the vehicle pursuit policy.  Defendant Officer Hummel concludes, "Cowboys and Indians.  Horses everywhere."**

228.    The Cleveland Police Vehicle Pursuit Policy stated, "Pursuing officers shall become the

back-up unit if driving an unmarked unit . . . when a marked unit with a light bar and siren is

available as the primary pursuit unit . . ."

229.    The Malibu exited I-90 at East 72nd Street. Defendant Sergeant Coleman and Officer

Miranda, driving unmarked 285, then took the lead position when Defendant Officers Siefer

and Hummel "spun out a little bit . . ."

230.    Defendant Sergeant Coleman began calling the pursuit from the unmarked police car,

despite CPD policy requiring unmarked police cars to surrender the lead position to marked

police cars.

231.    Officer Fairchild, who also drove an unmarked police car, was second from the lead, but

overtook Defendant Sergeant Coleman and Officer Miranda for the lead position at East 72nd

Street and St. Clair Avenue.

232.    The police pursuit of the Malibu began to aggravate Defendant Officer Hummel.  He

described the unmarked police cars jockeying for lead position, instead of letting him and

Defendant Officer Siefer lead as, "Cowboys and Indians. Horses everywhere."

**E. Officer Fairchild broadcasts the "Passenger just put his hands out asking us to stop. He does not have a gun.  He has black gloves on." Supervisors fail to reduce the size and firepower of the pursuit.**

233.    While still in the lead, Officer Fairchild personally observed the passenger holding a pop

can and not a gun.  He broadcast over police radio "Passenger just put his hands out asking

us to stop.  He does not have a gun.  He has black gloves on."

234.    Officer Fairchild broadcast that the threat 64 police police cars believed they were

chasing did not exist. The danger was at best, misperceived and at worst exploited by overly

aggressive police officers enabled by a custom and practice that granted them the discretion

to conduct themselves as they pleased.

235.    Officer Fairchild's broadcast caused the absurd. Defendant Officer Michael Demchak

told BCI investigators that the driver and passenger were "bad mother fuckers" for "being

casual, drinking pop" during a police pursuit.

236.    Despite Officer Fairchild's critical realization and immediate broadcast, no Supervisor,

including Defendant Sergeant Coleman or Defendant Sergeant Dailey, applied what Officer

Fairchild had discovered to the coordination and supervision of the pursuit. Defendant

Supervisors failed to take any steps to make clear to the officers in pursuit that the passenger

had a pop can, and not a gun. The conduct of Defendant Supervisors was deliberately

indifferent and reckless with respect to these failures.

F. **Defendant Sergeant Coleman unreasonably, willfully, wantonly and recklessly disregards Officer Fairchild's radio broadcast that the occupants of the Malibu are unarmed.**

237.    The pursuit turned eastbound on Wade Park.

238.    Defendant Supervisor Coleman broadcast, "Passenger is reaching for something underneath the glove box area," and "Looks like the passenger got, possibly loading a weapon."

239.    Dispatcher Sara George questioned the validity of Defendant Supervisor Sergeant Coleman's statement.  She even rhetorically asked BCI investigators, "How can you see the person re-loading?  How close are you?"

240.    The pursuit turned southbound on East 118th Street, then eastbound on Euclid Avenue.

241.    The pursuit passed Eddy Road and the Malibu cut through the parking lot of Happy's Pizza at 14252 Euclid Avenue.

242.    When Officer O'Neill was second from the lead in the car driven by Defendant Officer Diaz on Wymore Avenue, just seconds from Heritage Middle School, she admitted the Malibu's interior was too dark to see anyone doing anything inside it.

243.    Less than 50 seconds later, the Mailbu's passenger, Ms. Williams and the Malibu's driver, Mr. Russell, had been brutally shot to death.

G. **Defendant Officers' conduct at the Heritage Middle School constituted an unreasonably excessive use of force in violation of the Fourth and Fourteenth Amendments, Ohio law and the Cleveland Police Department's Use of Force Policy.**

244.    The Cleveland Police Use of Force Policy states that officers will be trained and tested yearly on the use of force, appropriate methods to effect arrests, and the apprehension of fleeing subjects. (Use of Force Policy at 2).

245.    The force used on Ms. Williams and Mr. Russell corresponds to the highest level of force on the Cleveland Police Department's Action-Response Continuum.

246.    The Cleveland Police Use of Force Policy instructs that "officers shall not unreasonably place themselves in a position where threat of imminent danger of death or serious physical injury is created when attempting to stop a motor vehicle…" (Use of Force Policy at 11).

247.    The Cleveland Police Use of Force Policy instructs that "Firing at or from a moving vehicle is rarely effective and presents extreme danger to innocent persons…" It also instructs that "Many vehicles involved in violations are driven by persons whose age or reasons for fleeing do not justify the use of firearms as a means of apprehension." (Use of Force Policy at 11).

248.    The Cleveland Police Use of Force Policy instructs "**Intentionally firing at a moving vehicle is prohibited unless there is imminent danger of death or serious injury to officers andor other persons, where other means are not available to avert or eliminate the threat, and where feasible, some warninng has been given.**" (empahsis in original).

249.    The Defendant Officers' conduct in shooting and killing Plaintiffs constituted violations of the Cleveland Police Use of Force Policy.

250.    The Defendant Officers' conduct constituted an unreasonable and excessive use of deadly force against suspects that they knew or should have known were unarmed based upon radio broadcasts made by fellow officers during the purusit of the Malibu.

251.    The Defendant Officers' use of force also constituted an assault and battery of both Ms. Williams and Mr. Russell.

**H. Defendant City of Clevleland established a custom and practice whereby members of the Cleveland Police Department were granted unfettered discretion when responding to officers who needed, or who were perceived to need, asssistance. This custom and practice was a moving force behind the constitutional injuries suffered by Ms. Williams and Mr. Russell.**

252.　Ms. Williams's and Mr. Russell's deaths were caused, in part, by a systemic failing in the Cleveland Police Department that perpetuates an unwritten, pervasive custom and practice of authorizing and ordering subordinate officers to deliberately disregard policies and procedures, as well as direct orders, if there is so much as a perception that an officer needs assistance.

253.　Defendant Supervisor Dailey admitted that within the Cleveland Police Department an accepted custom or practice that exempts patrol officers from abiding by established policies and procedures as well as supervisory orders, in the event they perceive that police radio traffic indicates an officer needs assistance.

254.　As a result of this custom or practice, patrol officers are granted unfettered discretion to respond and assist however they so choose when they perceive an officer needs assistance.

255.　This custom and practice makes foreseeable the uncontrolled and uncontrollable 64-car police pursuit. It also makes foreseeable the subsequent unreasonably use of excessive and unreasonable deadly force that caused the deaths of Ms. Williams and Mr. Russell.

256.　Admissions to BCI investigators after the incident exposed the existence of this custom and practice within the Cleveland Police Department.

257.　Defendant Supervisors Dailey, Coleman and Putnam all conducted themselves in a manner that demonstrated their understanding and perpetuation of this custom and practice of granting patrol officers discretion to respond to perceived risks to other officers' safety in contradiction of their policies and procedures and/or a supervisor's direct order.

258.   That 64 patrol cars became involved in a confused and unreasonable police chase that was even led by Defendant Sergeant Coleman in direct violation of departmental policy and procedure, demonstrates that supervisors in the Cleveland Police Department perpetuate and promote this custom.

259.   That 13 Defendant Officers fired their weapons in an unreasonable and excessive use of deadly force, and did so after police radio traffic had broadcast that the Malibu's occupants did not possess a gun, confirms that officers conduct themselves with the knowledge that custom and practice grants them unfettered discretion when responding to perceived risks to other officers' safety.

260.   This custom and practice was a moving force behind constitutional violations suffered by Ms. Williams and Mr. Russell and also caused the assault and battery each sustained.

**I.   Defendant Supervisors Coleman, Dailey and Putnam are each individually liable because they perpetuated and employed the Cleveland Police Department's custom and practice of granting unfettered discretion to patrol offices responding to radio traffic and acquiesced to their subordinates constitutional violations.**

261.   Defendants Coleman, Dailey and Putnam, as well as the John/Jane Doe Supervisors, were responsible for coordinating and supervising those subordinate officers who involved in the pursuit and unreasonable excessive force against Plaintiffs.

262.   Defendant Supervisors Coleman, Dailey and Putnam each were involved in the pursuit and/or use of excessive force against Plaintiffs on November 29, 2012.

263.   Defendant Supervisors Coleman, Dailey and Putnam each failed to supervise during the pursuit and use of excessive force by their subordnate officers, even when they presented with information, or physically witnessed conduct that imparted awareness that their subordinates were violating the rights of Ms. Williams and Mr. Russell.

264.    In addition, Defendant Dailey admitted to BCI that he was unaware that 64 cars—62

more than policy and procedure allowed for police pursuits—had become involved in the

pursuit because he deferred to the decision-making of the patrol officers conducting the

pursuit that he was ultimately responsible for while he just listened.

265.    As a result, Defendant Supervisors Dailey, Coleman, and Putnam each acquiesced to the

continued constitutional violations committed by their subordinate officers; officers they

were responsible for supervising and failed to command.

**J.  Negligent supervision of the pursuit and shooting in violation of Ohio law.**

266.    The Defendant Supervisors Dailey, Coleman and Putnam, as well as the John/Jane Doe

Supervisors, negligently supervised the Defendant Officers by acting negligently, recklessly,

wantonly, and maliciously with respect to their duty to supervise officers who pursue citizens

and use force to seize and subdue them.

267.    Each of these Defendant Supervisors perpetuated the Cleveland Police Department's

custom and practice that delegates unfettered discretion to patrol officers to choose how to

respond to situations that may involve fellow officers.

268.    These Defendant Supervisors' negligent supervision of the officers during the pursuit and

the use of excessive force made the excessive and gratuitous force used on Ms. Williams and

Mr. Russell foreseeable. It also proximately caused the excessive force and assault and

battery in Ms. Williams and Mr. Russell.

269.    There was an employer/employee relationship between each Defendant Officer and

Supervisor and the City of Cleveland.

**K.  The policy of inadequate supervision, investigation and training by the City of Cleveland**

270.   The training and supervision provided by the Cleveland Police and City of Cleveland to the Defendant Officers who used force on, or who failed to protect Ms. Williams and Mr. Russell from the use of force in this case, was inadequate to protect citizens at risk of arrest by officers using excessive force, including Ms. Williams and Mr. Russell.

271.   This inadequacy was due to the City of Cleveland's and the Supervisor Defendant Officers' deliberate indifference to the need for adequate use of force review and discipline in the face of multiple prior instances of questionable use of force and inadequate reporting by the Defendant Officers.

272.   It was foreseeable that the failure to review, discipline, and train the Defendant Officers regarding their felony stops and use of force would result in additional instances of excessive force being used on citizens.

273.   The Cleveland Police Department rarely, if ever, reprimands or punishes its officers for using excessive force. This despite the fact that the number of suspects who are injured and/or taken to the hospital, and the morgue, is alarming.

274.   African American or other racial minorities are predominantly victims of excessive force at the hands of the Cleveland Police Department.

275.   Questionable use of force, and significant flaws in use of force reporting did not result in discipline or corrective action with respect to any of the Defendant Officers who used force on or failed to protect Ms. Williams and Mr. Russell from harm and injury.

276.   Investigation into the use of force at the Cleveland Police Department and City of Cleveland has at all times relevant to this action been completely inadequate, resulting in a

review system which does not investigate alleged excessive force or punish inadequate reporting or failures to report, and rubber-stamps officers' use of force.

277. The Cleveland Police Department's and City of Cleveland's history of questionable uses of force by its public safety officers caused the Department of Justice to initiate an ongoing "patterns and practices" review of the Cleveland Police Department to assess whether a department wide pattern and practice of using excessive force exists.

278. Inadequate "reality-based" and "true-to-life" use of force training of officers has historically been identified as a training deficiency within the Cleveland Police Department.

279. The Department of Justice provided the City of Cleveland written notice of these training deficiencies in 2002 and 2004. The City of Cleveland has been deliberately indifferent to these deficiencies by failing to implement any training program to address or otherwise remedy them.

280. This inadequate training, supervision and investigation is a proximate cause of the use of force used on Ms. Williams and Mr. Russell.

**L.  INJURIES TO MALISSA WILLIAMS**

**A.  Ms. Williams suffered twenty-four (24) bullet wounds and experienced terrorizing conscious pain and suffering**

281. At 11:10pm on November 29, 2012, Dr. Haynesworth of the Cuyahoga County Medical Examiner's office observed Ms. Williams in the front passenger seat of the Malibu with serious visible injuries and pronounced her dead "as the result of criminal or other violent means."

282. Two days later, at 7:17am on December 1, 2012, Dr. Joseph Felo of the Cuyahoga County Medical Examiner's office performed an autopsy of the corpse to determine the full extent of the injuries that caused Ms. Williams's wrongful death.

283.    Dr. Felo determined that Ms. Williams died from twenty-four (24) gunshot wounds –
specifically, sixteen (16) penetrating gunshot wounds of the head, neck, trunk (shoulder,
chest, abdomen and pelvis), and left arm, with multiple visceral, vascular and skeletal
injuries, and eight (8) perforating gunshot wounds of the head, left breast and left arm.  She
also suffered from several other wounds besides those caused by gunshots.

284.    A "penetrating" gunshot wound occurs when a bullet enters the body, but remains
somewhere inside the tissue.  A "perforating" gunshot wound occurs when a bullet enters the
body and passes all the way through.  Therefore, unlike a penetrating gunshot wound, a
perforating gunshot wound would typically include both an entrance and an exit, but without
a bullet to extract.  Alternatively, a perforating gunshot wound could mar the body without
leaving either a bullet or an exit wound, such as from a bullet that cuts across the flesh and
not through it.

### A. Penetrating Gunshot Wounds of the Head.

285.    On examination of Ms. Williams's head, Dr. Felo observed that her left eye was
"traumatically collapsed."  The lid of her left eye appeared torn apart by an "irregular
laceration" and her eyeball sank deep into her socket.  The bullet entered her left orbital bone
and penetrated her spinal tissue and the left back gum of Ms. Williams's mouth.  Dr. Felo
extracted a deformed copper jacketed bullet from her skull and metal fragments from her
mouth.

286.    Dr. Felo observed another "irregular laceration" on the left of Ms. Williams's scalp.  The
wound appeared as an "eccentric black-red" abrasion just behind the ruptured cartilage of
Ms. Williams's mutilated left ear.  The bullet fractured her skull and came to rest in the

46

temporal lobe of her brain.  Dr. Felo extracted an irregular gray and copper bullet from Ms. Williams's temporal lobe.

### B. Penetrating Gunshot Wounds of the Neck.

287.    Dr. Felo observed that Ms. Williams's neck appeared riddled with bullet holes – one puncturing her neck just below her left earlobe, the second on the left side of her neck, and the third on the right side of her neck.  Dr. Felo extracted copper jacketed bullets from the front of Ms. Williams's neck, the soft tissue of her spine, and the soft tissue of her thoracic vertebrae.

### C. Penetrating Gunshot Wounds of the Shoulder.

288.    Dr. Felo observed a bullet hole that had penetrated Ms. Williams's left rear shoulder.  He extracted a copper metal jacketed bullet from the soft tissue of the wound.

289.    Another bullet entered the soft tissue near Ms. Williams's left front underarm.  The wound left a "red-black-yellow" abrasion and an "irregular fracture" in Ms. Williams's left sixth rib.  Dr. Felo extracted a black-copper metal jacketed bullet from the soft tissue of the wound.

### D. Penetrating Gunshot Wounds of the Chest.

290.    Three bullet holes were observed in a triangular pattern on Ms. Williams's upper chest.  The first bullet penetrated Ms. Williams's upper right chest and tore through her right lung, causing her lung to hemorrhage.  Dr. Felo extracted a deformed copper metal jacketed bullet from the soft tissue between Ms. Williams's right rear ribs.  The second bullet penetrated Ms. Williams's upper left chest, tore through her left lung, and fractured her sternum and her right ninth rib.  Dr. Felo extracted a copper metal jacketed bullet from the soft tissue of the wound.  The third bullet penetrated Ms. Williams's upper chest at the midline, creating the

point of the triangular pattern, and left a "yellow-brown and red-black" abrasion along its trajectory through Ms. Williams's body and into the cartilage of her right fifth rib.  Dr. Felo extracted a copper metal jacketed bullet from the soft tissue of the wound.

291.    Another bullet penetrated Ms. Williams's body at her lower chest to the right of her left breast.  The path of this bullet tore through her heart, her right kidney and the soft tissue of her right twelfth rib.  Dr. Felo extracted a copper metal jacketed bullet from the soft tissue of the wound.

**E. Penetrating Gunshot Wounds of the Abdomen.**

292.    At the upper left of Ms. Williams's abdomen, just below her left breast, Dr. Felo observed a "black-tan-pink" abrasion.  The path of this bullet tore through her heart, her liver and her stomach.  Dr. Felo extracted a copper metal jacketed bullet from the soft tissue of the wound.

293.    Beneath that bullet hole, Dr. Felo observed another "brown-black and pink" abrasion at Ms. Williams's lower abdomen, just above her belly button.  The path of this bullet tore through her small intestines and her pancreas, causing her pancreas to hemorrhage.  Dr. Felo extracted a copper metal jacketed bullet from her spinal connective tissues.

**F. Penetrating Gunshot Wounds of the Pelvis.**

294.    Dr. Felo observed two bullet holes in Ms. Williams's right pelvis.  He extracted copper metal jacketed bullets from each of these wounds.

**G. Penetrating Gunshot Wound of the Left Arm.**

295.    Dr. Felo observed a "circular laceration" on Ms. Williams's left upper arm, where the bullet fractured her "humerus" bone.  He extracted a deformed copper jacketed bullet from the soft tissue of her arm.

**H. Perforating Gunshot Wound of the Head.**

296.　A perforating bullet carved its trajectory across Ms. Williams's skull, leaving in its wake a jagged laceration atop her scalp.

**I. Perforating Gunshot Wounds of the Left Breast.**

297.　Two perforating bullets, traveling left to right and downward across Ms. Williams's left breast, shredded apart the areola of her left nipple.

**J. Perforating Gunshot Wounds of the Left Arm.**

298.　Five perforating bullets entered and exited Ms. Williams's left arm.

**K. Incisions, Abrasions, Lacerations and Contusions.**

299.　In addition to the penetrating and perforating gunshot wounds aforementioned, Dr. Felo further observed other wounds on Ms. Williams's body that were caused by blunt force and sharp objects.

300.　Ms. Williams suffered from multiple incisions, "red-purple" abrasions, and lacerations on her face, her right arm, her right hand, her left hand, her left index finger, and her left middle finger.

301.　Ms. Williams suffered from an irregular "red-black" abrasion over her front left underarm.

302.　Ms. Williams suffered from a "yellow-red" abrasion over her front left upper abdomen and her front right lower abdomen.

303.　Ms. Williams suffered from a "dark red" abrasion on her right index finger.

304.　Ms. Williams suffered from a "brown" abrasion on her right hand.

305.　Ms. Williams suffered from two "white-pink" abrasions on her left elbow.

306.    Ms. Williams suffered from a "purple-pink" contusion, "dark red-purple" contusion, and

a "dark red and purple-pink" contusion all on her right upper leg.

**L. Conscious pain and suffering**

307.    Ms. Williams conscious pain and suffering includes but is not limited to the following:

308.    Ms. Williams suffered terrorizing conscious pain and suffering.

309.    She suffered psychologically as a result of the gunshots entering Mr. Russell's body.

310.    She suffered psychologically as the gunshots hit the Malibu.

311.    She heard the sounds of the gunshots.

312.    She suffered psychologically as the gunshots ripped through her body because she knew

she was being shot.

313.    She suffered physically from debris such as glass and interior parts of the car flying at

and into her.

314.    She suffered physically as the bullets, fragments and searing lead entered her body.

315.    As a direct and proximate result of each Defendants' act Ms. Williams injuries include

those describer above and those listed in the autopsy report.

316.     The autopsy report simply described the officers' actions and the injuries as resulting

from a as a Homicide.

**M. INJURIES TO TIMOTHY RAY RUSSELL**

**A.  Mr. Russell suffered twenty-three (23) bullet wounds and experienced terrorizing conscious pain and suffering**

317.    At 11:10 p.m. on November 29, 2012, Dr. Haynesworth of the Cuyahoga County Medical

Examiner's office observed Mr. Russell in the front driver's seat of the Malibu with serious

visible injuries and pronounced him dead "as the result of criminal or other violent means."

318.   Two days later, at 10:15 a.m. on December 1, 2012, Dr. Joseph Felo of the Cuyahoga County Medical Examiner's office performed an autopsy of the corpse to determine the full extent of the injuries that caused Timothy Ray Russell's wrongful death.

319.   Dr. Felo determined that Timothy Ray Russell died from twenty-three (23) gunshot wounds.  He also suffered from several other wounds besides those caused by gunshots.

B. **Conscious pain and suffering**

320.   Mr. Russell's conscious pain and suffering includes but is not limited to the following:

321.   Mr. Russell suffered terrorizing conscious pain and suffering.

322.   He suffered psychologically as a result of the gunshots entering Ms. Williams' body.

323.   He suffered psychologically as the gunshots hit the Malibu.

324.   He heard the sounds of the gunshots.

325.   He suffered psychologically as the gunshots ripped through his body because he knew he was being shot.

326.   He suffered physically from debris such as glass and interior parts of the car flying at and into him.

327.   He suffered physically as the bullets, fragments and searing lead entered his body.

328.   As a direct and proximate result of each Defendants act, Mr. Russell's injuries include those described above and those listed in the autopsy report.

329.    The autopsy report simply described the officers' actions and the injuries as resulting from a Homicide.

### V. FIRST CAUSE OF ACTION - 42 USC §1983 EXCESSIVE FORCE

**(Defendant Officers, Defendant Supervisors Coleman, Putnam and Dailey)**

330.   Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

331.    Defendants have, under color of law, deprived Ms. Malissa Williams and Mr. Timothy

Ray Russell of rights, privileges, and immunities secured to them by the Fourteenth

Amendment to the United States Constitution, including the prohibition on unreasonable

searches and seizures contained in the Fourth Amendment to the United States Constitution,

by either using excessive force on citizens and/or ratifying the use of excessive force and/or

failing to intervene to prevent officers from continuing to use excessive force. Each of which

was a proximate cause of the unreasonable use of excessive force and the constitutional

violations that resulted in the deaths of Ms. Williams and Mr. Russell on November 29,

2012.

## VI. SECOND CAUSE OF ACTION - 42 USC §1983 MONELL CLAIM FOR CITY CUSTOM AS MOVING FORCE BEHIND EXCESSIVE FORCE

### (Defendant City of Cleveland)

332.    Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

333.    It is the custom and practice in the Cleveland Police Department that Supervisors do not

supervise, coordinate or direct police pursuits when they or their subordinate officers

perceive some risk to "one of their own."

334.    As a result, patrol officers in the Cleveland Police Department are granted unfettered

discretion to pursue and subdue people they perceive as threats to fellow officers however

they choose, not only in contravention of the police department's rules, regulations, policies

and procedures, but in contravention of direct orders from supervisors. This lack of

communication, command, control, coordination and supervision makes foreseeable

excessive and unreasonable use of deadly force by officers, including the Defendant Officers.

335.    The execution of this custom and practice inflicted a constitutional injury upon Ms.

Malissa Williams and Mr. Timothy Russell. Their Fourth Amendment rights to be free from

an unreasonable seizure was proximately caused by the Cleveland Police Department's

custom of granting officers the authority and unfettered discretion to conduct themselves

however they saw fit, without concern for the results and repercussions of their conduct,

including the death of narmed citizens like Ms. Williams and Mr. Russell.

336.    The custom described above amounts to a deliberate indifference by officers and the City

of Cleveland to the constitutional rights of Ms. Malissa Williams and Mr. Timothy Russell

with whom the police came into contact on November 29, 2013.  The custom and deliberate

indifference of Supervisors and the City of Cleveland were a moving force behind the

constitutional violation.

## VII. THIRD CAUSE OF ACTION-§ 1983 FAILURE TO SUPERVISE

### (Defendant Supervisors Dailey, Coleman and Putnam)

337.    Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

338.    Defendant Supervisor Dailey was the Cleveland Police Department Supervisor

responsible for commanding subordinate officers during the pursuit of the Malibu on

November 29, 2012.

339.    Defendant Supervisor Dailey acquiesced to his subordinates' violations of Ms. Williams's

and Mr. Russell's constitutional rights. He acted with deliberate indifference to the

consequences of his failure to supervise, and established and maintained a policy, practice,

and/or custom that granted officers, including the Defendant Officers and the John and Jane

Doe Cleveland Police Officers, unfettered discretion in conducting themselves during and

after the pursuit, including during the use of excessive and unreasonable force at Heritage

Middle School.

340.     Defendant Supervisors Coleman and Putnam each were Cleveland Police Department Supervisors present at the scene of the shooting at Heritage Middle School on November 29, 2012. Each was responsible for commanding subordinate officers, including the Defendant Officers who used excessive force or who failed to intervene to prevent the continued use of excessive force at the Heritage Middle School on November 29, 2012.

341.     Defendant Supervisors Coleman and Putnam acquiesced to their subordinates' violations of Ms. Williams and Mr. Russell's constitutional rights. Each acted with deliberate indifference to the consequences of their failure to supervise, and established and maintained a policy, practice, or custom that granted patrol officers, including the Defendant Officers and John and Jane Doe Cleveland Police Officers unfettered discretion to use excessive and unreasonable force against Ms. Williams and Mr. Russell at the Heritage Middle School on November 29, 2012.

342.     Supervisor Defendants Dailey, Coleman and Putnam's failure to supervise was the moving force behind the underlying constitutional violations suffered by Ms. Williams and Mr. Russell, as well as the violations of state law for assault and battery.

## VIII. FOURTH CAUSE OF ACTION-ASSAULT AND BATTERY

### (Defendant Officers)

343.     Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

344.     The Defendant Officers intentionally and maliciously applied and/or threatened to apply unnecessary and unlawful force against Ms. Williams and Mr. Russell.

345.     The Defendant Officers did not have the consent or acquiescence of Ms. Williams and Mr. Russell to apply force.

## IX.  FIFTH CAUSE OF ACTION-STATE LAW NEGLIGENT SUPERVISION

### (Defendant Supervisors Dailey, Coleman and Putnam)

346.    Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

347.    On November 29, 2012, Supervisor Defendants Dailey, Coleman and Putnam negligently

supervised the Officer Defendants by permitting them to use excessive force and engage in

police practices and conduct that foreseeably results in the application of excessive force.

348.    These Supervisor Defendants' conduct was willful, wanton, reckless, malicious and in

bad faith.

349.    Ms. Williams's and Mr. Russell's injuries were a proximate cause of these Supervisor

Defendants' negligent supervision of the Officer Defendants.

## X. SIXTH CAUSE OF ACTION-STATE LAW NEGLIGENT RETENTION

### (City of Cleveland, Chief McGrath, Director Flask)

350.    Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

351.    The Chief of Police, Michael McGrath, Safety Director Martin Flask and the City of

Cleveland knew and/or had constructive knowledge that the Defendant Officers were

incompetent when performing their pursuit duties and when using force, the officers

routinely violated departmental policies with respect to pursuits and use of force, were not

adequately disciplined during their career with the Cleveland Police Department and were

incompetent.

352.    These Defendants were negligent and acted willfully, wantonly, recklessly, maliciously

and inadequately.

353.    Ms. Williams's and Mr. Russell's injuries were a proximate cause of these Defendants'

retention and supervision of the Officer Defendants.

## XI. SEVENTH CAUSE OF ACTION-SURVIVORSHIP ACTION

354.    Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

355.    Ms. Williams and Mr. Russell experienced pre-death agony and conscious pain and suffering as a direct and proximate result of each Defendants conduct.

## XII. EIGHTH CAUSE OF ACTION-WRONGFUL DEATH

356.    Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

357.    Defendants' actions caused the wrongful death of Ms. Malissa Williams and Mr. Timothy Ray Russell resulting in damages recoverable under R.C. 2125.02.

## XIII.  NINTH CAUSE OF ACTION –WILLFUL, WANTON AND RECKLESS CONDUCT

### (All Defendants)

358.    Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

359.    All of the Defendants, while engaged in police functions, failed to exercise due care and acted in a willful, wanton and reckless manner.  The Defendant Supervisors, Defendant Officers,  and other Officials acted in a willful, wanton and reckless manner relative to the supervision, pursuit, and use of force involving Ms. Williams and Mr. Russell.

360.    Each of the named Defendants, as set forth herein, engaged in negligent, reckless, and willful and wanton conduct such that they are not entitled to the immunities set forth in O.R.C. § 2744.01 *et seq.*

361.    As a direct and proximate result of the negligent, reckless and willful and wanton misconduct of the Defendants, Timothy Ray Russell and Malissa Williams sustained agonizing pain and suffering and were ultimately killed.

## XIV. DAMAGES

362.    Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

363.    Timothy Ray Russell is survived by his minor son, Timothy Jerone Russell, Jr.; his

father, David Russell, Sr; his brother, Dave Russell, Jr.; his sister Michelle Denise Russell;

his brother, Donald Ray Russell; his brother, Michael Jerome Russell; and other next of kin,

all of whom are beneficiaries of this action.

364.    Malissa Williams is survived by her mother, Martha Williams and other next of kin as

identified by law in the State of Ohio, all of who are beneficiaries in this action.

365.    Decedent Timothy Ray Russell's beneficiaries suffered damages for loss of his services

over the time he was expected to live.

366.    Decedent Malissa Willaims's beneficiaries suffered damages for loss of her services over

the time she was expected to live.

367.    Decedent Timothy Ray Russell's beneficiaries suffered damages for the loss of his

society over his life expectancy, including loss of companionship, consortium, care,

assistance, attention, protection, advice, guidance, counsel, instruction, training and

education.

368.    Decedent Malissa Williams's beneficiaries suffered damages for the loss of her society

over her life expectancy, including loss of companionship, consortium, care, assistance,

attention, protection, advice, guidance, counsel, instruction, training and education.

369.    Decedent Timothy Ray Russell's heirs at law, at the time of his death, suffered damages

for loss of prospective inheritance.

370.    Decedent Malissa Williams's heirs at law, at the time of her death, suffered damages for

loss of prospective inheritance.

371.    Beneficiaries of Decedents Malissa Williams and Timothy Ray Russell all suffered

damages for the mental anguish caused by their decedent's death.

372.    Reasonable funeral and burial expenses in the approximately amount of $10,000.00 each

were incurred on behalf of Decedent Timothy Ray Russell and Decedent Malissa Williams.

### XV. JURY DEMAND

373.    Plaintiff hereby demands a trial by jury of all issues triable by jury.

### XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.    Award Plaintiffs compensatory damages in an amount to be shown at trial;

B.     Award Plaintiffs punitive damages in an amount to be shown at trial;

C.    Award Plaintiffs reasonable attorney's fees, interest, costs and disbursements;

D.    Grant Plaintiffs injunctive relief compelling the City of Cleveland and its police

department to establish appropriate changes in policies, procedures, and training to prevent such

actions as alleged in this complaint to occur in the future, and the appointment of a special

master to implement such changes.

E.    Grant Plaintiffs such additional relief as the Court deems just and proper.

Respectfully submitted,


*/s/ David B. Malik*
DAVID B. MALIK (0023763)
SAMUEL S. RIOTTE (0082678)
BRADLEY LEVINE (0090286)
8437 Mayfield Rd.
Chesterland, OH 44026
(P): (440) 729-8260
dbm50@sbcglobal.net
s.s.riotte@gmail.com
bradleylevine@gmail.com

TYRONE E. REED (0030839)
11811 Shaker Blvd.
Suite 420

*/s/ Terry H. Gilbert*
TERRY H. GILBERT  (0021948)
GORDON S. FRIEDMAN  (0021946)
Friedman & Gilbert
55 Public Square, Suite 1055
Cleveland, OH  44113-1901
Telephone:  (216) 241-1430
Facsimile:  (216) 621-0427
E-Mail:  tgilbert@f-glaw.com
gorlaw@f-glaw.com

RICHARD J. PEREZ (#0010216)
230 State Route 306, Suite 240
Willoughby, OH  44094

Cleveland, Ohio 44120
(P): 216.231.7936
t_reedlaw@msn.com

*Attorneys for Plaintiff Elizabeth Goodwin,*
*Administrator of the Estate of Malissa*
*Williams, Deceased*


/s/ *Paul J. Cristallo*
PAUL J. CRISTALLO  (0061820)
55 Public Square, Suite 1055
Cleveland, OH  44113-1901
Telephone:  (216) 456-0925
Facsimile:  (216) 621-0427
E-Mail: cristallolaw@gmail.com

DONALD C. WILLIAMS  (0029050)
1370 Ontario Street, Suite 330
Cleveland, OH  44113
Telephone:  (216) 696-4345
Facsimile:  (216) 621-4458
E-Mail:  dcordelllaw@aol.com

*Attorneys for Beneficiaries, David Russell, Sr.,*
*Dave Russell, Jr.,  Michelle Denise Russell,*
*Donald Ray Russell and Michael Jerome*
*Russell*

Telephone:  (440) 953-1310
Facsimile:  (440) 953-1427
E-mail:  rick@perezlaw.com

*Attorneys for Plaintiff, Debora L. Bodnar,*
*Administrator of the Estate of Timothy Ray*
*Russell, Deceased*